IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:08CR3020 |
| | ) | |
| v. | ) | |
| | ) | |
| CHARLES KEITH MOSS, | ) | REPORT AND RECOMMENDATION |
| | ) | |
| Defendant. | ) | |
| | ) | |

The defendant has moved for an order suppressing all evidence and statements obtained as a result of the stop and search of the 2008 Nissan Versa he was driving on January 24, 2008. Filing 28. The defendant claims Kimball County Deputy Sheriff Christopher Engel lacked probable cause to stop his vehicle, and unlawfully searched defendant's vehicle without a warrant, probable cause, or defendant's valid consent.

The defendant also seeks to suppress "all evidence, and any statements taken from him, following the illegal stop of the rental vehicle on January 24, 2008." Filing 29, p. 2. As clarified by the defendant's brief, the defendant claims these statements are fruit of the illegal detention and search, and that "any incriminating statements made by him, following his illegal detention, were taken involuntarily and in violation of his Miranda rights and his Fifth Amendment privilege against self-incrimination." Filing 29, p. 7. The only statement challenged by the defendant was allegedly made at the scene of the traffic stop to Kimball County Chief Deputy Sheriff Jensen, who was supervising the defendant during Deputy Sheriff Engel's search of defendant's vehicle. The defendant allegedly told

Deputy Sheriff Jensen that the substance Deputy Sheriff Engel found in the vehicle was cocaine.[1] [Filing 29](), p. 7.

An evidentiary hearing was held on May 9, 2008.  See [filings 35]() (audio file) and [39]() (transcript).  Based on the evidence presented, I conclude the defendant's motion to suppress should be granted.

FACTUAL FINDINGS

Deputy Sheriff Engel completed training at the Nebraska Law enforcement training center, and he became a law enforcement officer for the Kimball County Sheriff's Department on June 5, 2007.

On January 24, 2008, at approximately 3:30 p.m., Deputy Sheriff Engel was performing traffic enforcement duties on Interstate 80 in Kimball County, Nebraska.  He was in a marked law enforcement vehicle positioned in the interstate median near mile marker 23.  The officer's vehicle was facing west, and he was using radar to clock the speed of motorists approaching over a crest in the eastbound interstate lanes when he observed a tan

---

[1]As to the statements at issue, the government and the defendant were "ships passing in the night."  The government offered no evidence concerning how the defendant's statement to Deputy Sheriff Jensen arose or was elicited on January 24, 2008, but instead presented evidence concerning the defendant's statements to DEA Special Agent Stacy Slater on January 31, 2008.  A fair reading of the defendant's brief clarifies that the defendant did not move to suppress defendant's January 31, 2008 statements to Special Agent Slater.  Therefore, this report and recommendation will not discuss whether defendant's statements to Special Agent Slater must be suppressed under either the Fourth or Fifth Amendments.

vehicle exceeding the speed limit.  The defendant's white vehicle
was traveling behind the speeding vehicle.

The officer began to initiate a traffic stop of the tan
vehicle, but had to wait for the defendant's vehicle to pass
before turning and entering the eastbound interstate lanes to
initiate the traffic stop.  When the officer entered the left
eastbound lane of the interstate, the defendant pulled to the
shoulder of the road.  Deputy Sheriff Engel passed the
defendant's vehicle to continue pursuing the tan vehicle, and
caught up with the tan vehicle at approximately mile marker 26.[2]

The officer was concerned that the defendant had pulled over
because he needed law enforcement assistance.  He therefore
proceeded to the Dix exit at mile marker 29, exited the
interstate, and waited at the stop sign at the top of the exit
for the defendant's vehicle to pass.  When the defendant's
vehicle proceeded under the Dix overpass, Deputy Sheriff Engel
re-entered the eastbound lanes of the interstate and begin to
follow it.

The defendant's vehicle was traveling in the right eastbound
lane behind a semi-truck.  The officer followed in the left
eastbound lane and began clocking the speed of approaching
westbound vehicles with radar.  From his position in the left
eastbound lane, Deputy Sheriff Engel observed the defendant's
vehicle pass the semi and re-enter the right eastbound lane.  The
defendant did not commit any traffic violation while passing the
semi.  However, as the defendant was traveling in front of the
semi, the officer saw approximately one-half of the defendant's

_____

[2]It is unclear whether the officer actually stopped the tan
vehicle, although the timing of events indicates he did not.

3

vehicle cross the center line and return to the right lane twice in less than a mile.  The defendant did not signal these lane changes.  The officer activated his overhead lights and initiated a traffic stop.  The events occurring during the traffic stop were recorded on the officer's in-car camera.  Ex. 1.

Deputy Sheriff Engel exited his vehicle and approached the passenger side of the defendant's vehicle.  The officer advised the defendant that he was stopped for crossing the center line, and the officer asked the defendant to produce his driver's license and the vehicle registration.  The defendant pulled out a pile of rubber-banded cards and produced a Missouri driver's license.  The defendant's hands were shaking.

The defendant responded to the officer's request for the vehicle registration by explaining that the vehicle was rented. Deputy Sheriff Engel asked to see the rental agreement, but the defendant initially had difficulty finding the rental agreement. The officer was able to see a rental agreement on the defendant's lap and asked the defendant if that was the agreement, but the defendant stated it was not the right one, and began to look through the papers located under his coat on the passenger seat. The officer noticed that one of the papers on the passenger seat was a Southwest Airlines document with the airport identification letters, "OAK."[3]  The officer also noticed a bag of oranges or grapefruit in the car.  As the defendant continued to search, the officer asked if the defendant was sure the rental agreement on his lap was not the right one.  The defendant re-checked that paperwork, discovered it actually was the correct agreement, and handed the agreement to the officer.

---

[3]"OAK" is the abbreviation for the Oakland International Airport in Oakland, California.

The defendant exited his vehicle and was pat-searched for weapons. The officer returned to the driver's seat of his vehicle, and the defendant was seated in the front passenger seat.

Deputy Sheriff Engel promptly radioed dispatch to check the defendant's driver's license and criminal history, and to determine if there were any outstanding warrants for the defendant's arrest. Ex. 1, 15:36. While awaiting a response, the officer asked the defendant about his travel plans. The defendant stated he was coming from Salt Lake City and traveling to Kansas. He stated he was employed by Union Pacific Railroad Company and needed to arrive in Kansas City by the following day. He explained he was returning from visiting a long-time friend in Salt Lake City. When asked what they did in Salt Lake City, the defendant stated only that they "hung out," and offered no further details about what they had done. The defendant further stated his health was poor; that a spot had been discovered on his liver and he was dying of cancer. He explained that the vehicle he was driving was the second rental vehicle picked up in Salt Lake City that morning. Both vehicles were rented from Hertz in Salt Lake City, he stated he returned the first vehicle because it had no windshield wiper fluid.

Deputy Sheriff Engel did not testify as to whether the defendant explained how he got to Salt Lake City, where he arrived from, or how or if the airline ticket was part of defendant's overall trip. The in-car camera tape reveals that the officer never asked the defendant for information about these trip details, and if the defendant offered this information during the stop, his statements are inaudible on the tape. Based on the evidence offered at the evidentiary hearing, I cannot

determine if the officer had no information concerning the defendant's complete trip itinerary, including his possible flight to Oakland, California, or whether the officer received this information and considered it plausible and irrelevant to any assessment of reasonable suspicion.

Approximately four minutes after the defendant was seated in the officer's vehicle, dispatch contacted Deputy Sheriff Engel and reported that the defendant was not the subject of any outstanding wants or warrants. However, dispatch also provided an initial report of a positive III, including a "1040," which indicates a past drug violation. Ex. 1, at 15:39. Dispatch was still collecting more detailed criminal history information regarding the defendant.

Approximately twelve minutes after the traffic stop was initiated, dispatch reported that the vehicle was properly registered by Hertz Rental Car in Salt Lake City. Dispatch also reported a "1050" for the defendant, indicating the officer should approach the defendant with extreme caution. Ex. 1, at 15:42.

Throughout the officer's conversation with the defendant in the vehicle, the defendant spoke softly, avoided eye contact with the officer, and his legs were fidgeting. Although the officer was venting cool air into the vehicle, and it was a cold January day, the defendant was sweating and complained of being hot. The defendant had advised the officer of his illness, and when the officer noticed the defendant sweating, he asked if the defendant was feeling okay. However, the officer never asked and the defendant never offered any specific information describing any

symptoms the defendant experienced as a result of his cancer and associated treatment.

Approximately fifteen minutes after the stop was initiated, Deputy Sheriff Engel gave the defendant a warning ticket and returned his driver's licence and rental agreement. Ex. 1, 15:44-45. The officer stated he was concerned about the defendant's safety and instructed the defendant to stop and rest if he was tired. He explained that the defendant was receiving a written warning, and no fines or points would be assessed for the violation. The officer and defendant exchanged parting pleasantries, and the defendant began to exit the vehicle.

As the defendant was opening the vehicle door, Deputy Sheriff Engel asked if the defendant was willing to stay a minute and answer some questions. The defendant remained in the vehicle, and closed the door. The officer explained that "some things" had come up during their conversation, specifically noting that the defendant's demeanor had raised concerns. The officer asked if the defendant he was familiar with Interstate 80, and stated it is frequently used to transport illegal drugs. The officer asked the defendant if he possessed any marijuana, crack cocaine, methamphetamine, large amounts of U.S. currency, or weapons. The defendant responded, "no" to each of these questions, specifically looking away when asked about cocaine.

Deputy Sheriff Engel then asked, "Would you mind if I just took a few minutes of your time and just did a search of your vehicle for any of those items?" Ex. 1, at 15:46:10-14. The defendant reached for the door handle, opened the door, and "tried to bail out of the vehicle." Ex. 1, at 15:47:40. The

officer immediately "kinda grabbed him,"[4] (ex.1, at 15:55:32-35), and stated, "Hey, can you stay here, okay?  I need you to stay here, okay."  The defendant "slammed the door and stayed in the vehicle."  Filing 39 (transcript), at 18:19.  The officer repeated his request for consent to search stating, "Would you mind if I did that?"  Ex. 1, 15:46:20-26.  The defendant did not consent and indicated he was reluctant to do so.  The officer asked for consent a third time, stating, "You mind if I do a search of the vehicle?"  Ex. 1, 15:46:25-28.  When the defendant was again unwilling to consent, the officer reached for his microphone located on the middle console and in the defendant's presence, called for another unit to help.  Returning his attention to the defendant, the officer stated, "I'm just asking you the question."  Ex. 1, at 15:46:40-42.  The defendant commented that he had been cooperative, but now felt he was being accused of something.  The officer denied accusing the defendant of anything.  The officer asked a fourth time, "You mind if I search the inside of the vehicle?"  The defendant responded by stating, "Yes, go ahead."  Filing 39 (transcript), at 53:19.  The officer repeated, "You don't mind if I do that?," and the defendant said, "No."  Ex. 1, at 15:47:00-08.  Shortly thereafter

---

[4]Although the officer testified that he did not "grab" the defendant, I find his conflicting statement to Chief Deputy Jensen made at the time of the stop and immediately after the event to be more credible.  Moreover, even if the officer did not actually grab the defendant, or even make contact with the defendant while moving his hand toward the middle console to reach a radio, there is no question this officer intended to keep the defendant in the vehicle and was conveying that message to the defendant.  A reasonable innocent person in the defendant's position would have interpreted the officer's verbal commands-- apart from any physical contact by the officer, whether intentional or inadvertent--as restraining his movement out of the vehicle.

the defendant commented, "Go ahead and search the vehicle, you won't locate those items." Filing 39 (transcript), at 17:20-21.

The defendant was instructed to remain inside the officer's vehicle. Deputy Sheriff Engel exited and stood in front of the vehicle awaiting the arrival of another officer. While he waited, dispatch provided more detail regarding the defendant's criminal history of drug and weapons violations. Within a minute after the officer exited the vehicle, the defendant opened the passenger-side window of the officer's vehicle and complained about the delay, stating the vehicle search could be over by then if the officer had started. Deputy Sheriff Engel explained, "I just asked you, okay!" "I'll wait for another unit to get here, okay?" Ex. 1, 15:48:00-07. The defendant was instructed to roll up the window all the way. Ex. 1, 48:15-30. The defendant was not locked in the officer's vehicle, and made no further attempts to exit the vehicle or initiate contact with the officer while awaiting and during the vehicle search.

In response to later questioning initiated by the officer, although the words are not clear on the in-car camera tape, it is apparent that the defendant complained about the delay and expressed a desire to travel on his way. That overture was rebuffed by the deputy. Ex. 1, 15:51:40-52:15.

It was apparent to the officer, (filing 39 (transcript), at 59:2-12), and evident on the video-recording of this stop, that the defendant was frustrated and wanted to leave once the traffic stop was complete. The officer never advised the defendant that he could refuse consent to search, but he also never stated that absent consent to search, a canine would be called to the scene, nor that defendant would be further detained. The officer did

not threaten or promise anything in exchange for the defendant's statement of consent.

Kimball County Chief Deputy Sheriff Jensen approximately ten minutes after the traffic stop was complete.  Ex. 1, 15:58:00. Deputy Sheriff Engel began to search the defendant's vehicle, starting with the passenger side and working toward the back seat and trunk.  He located suspected illegal drugs in a suitcase and in a pink and black sack.

When the suspected illegal drugs were found, the defendant apparently told Deputy Sheriff Jensen that the suitcase and sack contained cocaine.  Deputy Sheriff Jensen did not testify, and there is no evidence as to whether defendant's statement was volunteered or made in response to a question posed by Deputy Sheriff Jensen.  When Deputy Sheriff Engel asked the defendant to identify the substance, the defendant refused to answer.

A federal arrest warrant was later issued, and the defendant was scheduled to appear before the federal court in Omaha, Nebraska for his initial appearance.  DEA Special Agents Windom and Stacy Slater met with the defendant on January 30, 2008. Special Agent Windom advised the defendant of his Miranda rights by reading those rights aloud from the DEA's form.  The defendant acknowledged that he understood his rights.  Special Agent Slater witnessed the reading of rights and defendant's acknowledgment.

Due to the extensive travel distance between Kimball County, Nebraska and the Omaha/Council Bluffs area, the defendant's transport occurred over a two-day period.  The defendant was transported from Kimball County to a detention facility in Lexington, Nebraska on January 30, 2008, and he was transported

from Lexington to the Pottawattamie County Jail in Council
Bluffs, Iowa on January 31, 2008.

During the transport on January 31, 2008, the defendant
began talking to Special Agent Slater about his case.  Special
Agent Slater did not re-advise the defendant of his <u>Miranda</u>
rights, but before responding to the defendant's comments, did
confirm that the defendant remembered and understood his <u>Miranda</u>
rights.  The defendant then asked why his case was transferred to
the DEA.  He stated he had crossed the center line but should not
have been stopped because everyone does that.  He further stated
that he agreed to the search of his vehicle because he believed
that had he refused consent, a canine would have been brought to
the scene and would have "hit" on the vehicle.  He stated he did
not think the officer would find the drugs, but further noted he
normally hid them better.

DISCUSSION

The defendant challenges the traffic stop, claiming Deputy
Sheriff Engel lacked probable cause to initiate the stop.  The
defendant further claims the officer unlawfully detained him
following the stop, and asserts his vehicle was searched without
probable cause or the defendant's voluntary consent.  The
defendant further argues his statements must be suppressed under
the Fifth Amendment.

A.    <u>The Traffic Stop</u>.

"A traffic stop constitutes a seizure under the Fourth
Amendment. . . .  An officer who observes a violation of the law
has probable cause to initiate a traffic stop, and such a stop

comports with the Fourth Amendment." U.S. v. Peralez, 2008 WL
2038805, 3 (8th Cir. May 14, 2008) (citing Delaware v. Prouse,
440 U.S. 648, 653 (1979), and Pennsylvania v. Mimms, 434 U.S.
106, 109 (1977)). "[I]t is well established that a traffic
violation--however minor--creates probable cause to stop the
driver of a vehicle." U.S. v. Lyons, 486 F.3d 367, 371 (8th Cir.
2007). See also, U.S. v. Wright, 512 F.3d 466, 471 (8th Cir.
2008); U.S. v. Fuse, 391 F.3d 924, 927 (8th Cir. 2004); U.S. v.
Herrera-Martinez, 354 F.3d 932, 934 (8th Cir. 2004); U.S. v.
Linkous, 285 F.3d 716, 719 (8th Cir. 2002); U.S. v. Alcantar, 271
F.3d 731, 736 (8th Cir. 2001).

      "Courts are not to consider the motive for a stop as long as
the reason for the stop is valid." U.S. v. Jones, 275 F.3d 673,
680 (8th Cir. 2001). "An otherwise constitutional traffic stop
is not invalidated by the fact that it was 'mere pretext for a
narcotics search.'" Wright, 512 F.3d at 471 (8th Cir.
2008)(quoting U.S. v. Williams, 429 F.3d 767, 771 (8th Cir.
2005)). "[S]o long as the officer is doing nothing more than he
is legally permitted and objectively authorized to do, his actual
state of mind is irrelevant for purposes of determining the
lawfulness of the stop." Alcantar, 271 F.3d at 736.

      Deputy Sheriff Engel observed the defendant drive half his
vehicle across the center line and then back to right lane twice
in one mile. Failing to stay in the lane of traffic, and driving
on and crossing the center line without signaling is a violation
of Neb. Rev. Stat. § 60-6, 131. Johnson v. Crooks, 326 F.3d 995,
999 (8th Cir. 2002). Deputy Sheriff Engel had an objectively
reasonable basis for concluding the defendant had committed a
traffic violation, and his stop of the defendant's vehicle did
not violate the defendant's Fourth Amendment rights.

B.  <u>Illegal Detention</u>.


The defendant argues he was unlawfully detained after the
traffic stop was complete.  "A constitutionally permissible
traffic stop can become unlawful, however, 'if it is prolonged
beyond the time reasonably required to complete' its purpose."
Peralez, 2008 WL 2038805, at *3(quoting Illinois v. Caballes, 543
U.S. 405, 407 (2005)).


> During a traffic stop, an officer may detain the
> occupants of the vehicle while the officer completes a
> number of routine but somewhat time-consuming tasks
> related to the traffic violation.  The tasks include
> asking for the driver's license, the vehicle's
> registration, as well as inquiring about the occupants'
> destination, route, and purpose.  An officer may ask
> passengers these questions.  If complications arise
> during these routine tasks, the vehicle may reasonably
> be detained for a longer duration than when a stop is
> strictly routine.  Whether a traffic stop is reasonable
> in length is a fact-intensive question, and there is no
> per se time limit on all traffic stops.

Peralez, 2008 WL 2038805, at *3(internal citations and quotations
omitted).


Deputy Sheriff Engel detained the defendant for
approximately fifteen minutes to complete the traffic stop and
issue a warning ticket.  After the traffic stop was complete, he
asked if the defendant was willing to remain in the vehicle to
answer additional questions.  The defendant did so, the
additional questioning lasting for about a minute.  There is no
evidence or argument that the officer's act of questioning the
defendant about his possession of drugs, currency, or weapons
following the stop was anything other than a consensual
encounter.  Such encounters do not violate the Fourth Amendment.
United States v. Yang, 345 F.3d 650, 654 (8th Cir. 2003)("Law

enforcement officers do not violate the Fourth Amendment by asking a person for consent to search or other types of cooperation, even when they have no reason to suspect that person,'provided they do not induce cooperation by coercive means.'")(quoting United States v. Drayton, 536 U.S. 194, 201 (2002)).

The defendant argues, however, that he was unlawfully detained when he was not permitted to leave in response to the officer's request for consent to search.  The defendant claims he did not agree to this continued detention and the officer lacked a sufficient basis for reasonable suspicion to justify defendant's further detention.

The proper inquiry for determining if an encounter with law enforcement has become non-consensual is whether a reasonable person would feel free to terminate the encounter.  U.S. v. Drayton, 536 U.S. 194, 202 (2002).  The reasonable person test is objective and is based upon whether an innocent person in the position of the defendant would have felt compelled to speak with the officer, answer his questions, and cooperate with his requests.  Drayton, 536 U.S. at 202.

The court determines whether an encounter constitutes an unlawful detention or seizure on a case-by-case basis.  There is no litmus test distinguishing a consensual encounter from a seizure, and the test, such as it is, is "necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation."  Michigan v. Chesternut, 486 U.S. 567, 573 (1988).  "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to

'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." Chesternut, 486 U.S. at 573.  An officer can, but need not advise a defendant that he can refuse to cooperate, and the fact that the officer is in uniform and armed carries little weight in determining if an encounter with law enforcement is consensual. Drayton, 536 U.S. at 204, 207.

Deputy Sheriff Engel never told the defendant that he was free to leave.  Rather, when the defendant attempted to leave the officer's vehicle in response to the officer's request for consent to search, Deputy Sheriff Engel "kinda grabbed" the defendant and told him he needed to stay in the vehicle.  The defendant clearly evidenced his desire to leave, and the officer clearly commanded the defendant to stay.  Once these events occurred, a reasonable innocent person in the defendant's position would not have believed he could exit the officer's vehicle and drive away.  The initially consensual encounter of responding to the officer's standard questions regarding the possession of drugs, currency, and weapons quickly changed into a non-consensual detention of the defendant's person when the defendant appeared unwilling to consent to a vehicle search. U.S. v. Kirkpatrick, 5 F. Supp. 2d 1045 (D. Neb. 1998)(Kopf, J.)(holding consensual encounter became a non-consensual encounter when the trooper repeatedly asked to search vehicle, the defendant twice refused consent and asked if he could leave, and the trooper responded by instructing the  defendant to "shut the door" and calling defendant's name loudly as he attempted to exit).  See also, United States v. Wilson, 953 F.2d 116, 123 (4th Cir. 1991)(holding that where defendant consented to airport encounter but then attempted to terminate it by walking away and police followed and made repeated requests for consent to search,

the "officer's prolonged and persistent questioning after the suspect had conveyed an unequivocal unwillingness to engage in further conversation with the officer is the type of conduct that is proscribed by the Fourth Amendment"); U.S. v. Manuel, 791 F. Supp. 265, 268 (D. Kan. 1992)(holding defendant was unlawfully seized where after the defendant refused consent to search, officers persisted in requesting defendant's consent, asked him why he would not consent, informed him that they believed his package contained illegal drugs, did not inform him that he was free to go, and held onto his property).

A non-consensual detention does not violate the Fourth Amendment if the officer has a sufficient basis to reasonably suspect the motorist is engaged in criminal activity. U.S. v. Eustaquio, 198 F.3d 1068 (8th Cir. 1999). "An officer may expand the scope of a traffic stop beyond the initial reason for the stop and prolong the detention if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the stop is afoot." U.S. v. Chavez Loya, 2008 WL 2277553, *5 (8th Cir. June 5, 2008). "In evaluating whether a set of facts would give rise to reasonable suspicion, this court must look at the totality of the circumstances and not just each independent fact standing alone. Furthermore, the court may consider any added meaning that certain conduct might suggest to experienced officers in the field, trained in the observation of criminal activity." United States v. Jones, 269 F.3d 919, 926-927 (8th Cir. 2001).

As of the time the officer requested consent, the officer knew the defendant's driver's license was valid, and his statement that he rented the vehicle from Hertz in Salt Lake City had been confirmed as accurate. The defendant had stated that

the car he was driving was the second car assigned to him by
Hertz that morning, the first having been returned for lack of
windshield washer fluid.  Although the officer thought it was odd
to return a vehicle for this reason, it is not unusual or
unreasonable for a motorist renting a vehicle to insist that the
fluid reservoirs have been filled by the rental car company at
the outset of the rental period and before embarking on a cross-
country trip.  The officer testified that he saw oranges and/or
grapefruit in the vehicle, but he was not asked and did not
explain that this observation was significant to his assessment
of reasonable suspicion.  Likewise, the officer testified that he
saw a Southwest Airlines document in the vehicle, but he did not
ask the defendant anything about that document at the time of the
stop, and provided no testimony explaining whether or how this
document was relevant.  If the officer ever obtained information
on whether or how the defendant had traveled or intended to
travel to Salt Lake City, it is not discernable on the in-car
camera video recording and was not described during the officer's
testimony at the evidentiary hearing.

     The officer seemed to believe the defendant was suspiciously
evasive in failing to explain what he did with his friend while
in Salt Lake City.  In answer to the officer's question, the
defendant responded that they, "hung out."  Assuming this answer
cannot adequately describe what one does with a friend on a
weekend visit, no followup questions were asked.  Even had they
been, in the context of this stop, further questions regarding
what the defendant did with his friend in Salt Lake City would
have been unrelated to the purpose of the stop or any events or
suspicions arising during the course of the stop.  The officer
was not entitled to ask questions regarding the details of the
defendant's weekend.  Simply stated, although the government

claims the defendant "was unable to provide any details about his trip," ([filing 32](), p. 6), the defendant was not obligated to provide, and the officer was not entitled to, a more thorough response to the question.

The government argues that the defendant's "attempt[] to exit the vehicle without responding to Deputy Engel's request for permission to search the vehicle" supports a finding of reasonable suspicion.  [Filing 32](), p. 6.  There is no evidence that the defendant did anything other than exercise his right to ignore the officer and attempt to leave.   Police "cannot use [a defendant's] refusal to consent to the search of his bags as support for the requisite reasonable, articulable suspicion." [United States v. White, 890 F.2d 1413, 1417 n. 4 (8th Cir. 1989)](). An individual may decline an officer's request for consent to search without fearing prosecution, and his "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." [Florida v. Bostick, 501 U.S. 429, 437 (1991)]().  See also, [U.S. v. Wilson, 953 F.2d 116, 126 (4th Cir. 1991)]() ("[Courts] are wary of allowing the exercise of the unequivocal right to ignore the police to be grafted onto the 'reasonable suspicion' analysis.").

> If refusal of consent were a basis for reasonable
> suspicion, nothing would be left of Fourth Amendment
> protections.  A motorist who consented to a search
> could be searched; and a motorist who refused consent
> could be searched, as well. . . . [T]he requirements of
> reasonable suspicion and probable cause for warrantless
> searches and seizures "would be considerably less
> effective if citizens' insistence that searches and
> seizures be conducted in conformity with constitutional
> norms could create the suspicion or cause that renders
> their consent unnecessary."

U.S. v. Santos, 403 F.3d 1120, 1125-26 (10th Cir. 2005) (quoting
United States v. Hunnicutt, 135 F.3d 1345, 1348 (10th Cir.
1998)).

At the time he detained the defendant, Deputy Sheriff Engel
knew the defendant had a criminal history involving illegal drugs
and was known to carry weapons, although dispatch did not provide
a complete criminal history report until after the officer had
already stopped the defendant from leaving.  The officer had also
noticed that the defendant was shaking, fidgeting, and sweating;
avoided eye contact with the officer; was unable to immediately
locate his rental agreement; and looked away when asked about
possession of cocaine.  Extreme nervousness is a factor the court
can consider in assessing the existence of reasonable suspicion.
See e.g., U.S. v. Lebrun, 261 F.3d 731, 733 (8th Cir.
2001)(holding reasonable suspicion existed where the defendant
was sweating profusely even though the temperature was cold, was
constantly fidgeting, would not make eye contact with the
officer, had trembling hands, and there were drink containers,
food wrappers, a cellular telephone, a road atlas, pillows, and
blankets in the vehicle which, according to the officer's testimony,
were indicative of traveling without any stops as commonly done
by drug traffickers).

However, considered in the totality, the evidence adduced at
the evidentiary hearing on defendant's motion to suppress failed
to show that Deputy Sheriff Engel possessed a basis of
articulable facts sufficient to warrant a finding of reasonable
suspicion to believe the defendant was engaged in criminal
activity.  U.S. v. Jones, 269 F.3d 919 (8th Cir. 2001)(holding
the officer lacked reasonable suspicion where the defendant
initially denied but then admitted minor theft arrests and

exhibited the nervous behaviors of yawning, cracking in his voice, thumb shaking, and failure to make eye contact with trooper); U.S. v. Eustaquio 198 F.3d 1068 (8th Cir. 1999)(holding defendant's nervous movements, straight-ahead gaze, choice of a direct path to leave the airline terminal, lack of checked luggage, arrival from a source city for narcotics trafficking; same-day purchase of a one-way airline ticket with cash, absence of someone meeting her at the airport, and doing the opposite of what officer asked when he requested that she pull her shirt toward her body did not support of finding of reasonable suspicion); U.S. v. Beck, 140 F.3d 1129, 1133 (8th Cir. 1998)(finding no reasonable suspicion where the driver appeared nervous and the story of his trip seemed implausible; the vehicle was rented by an absent third party and licenced in California; there was fast food trash on the floor and no visible luggage; and the defendant was traveling from a drug source state to a drug demand state); U.S. v. Green, 52 F.3d 194, 198 (8th Cir. 1995)(finding no reasonable suspicion to detain an airline passenger who arrived from Phoenix, a known drug source city; was looking around like a person "conducting counter-surveillance;" appeared nervous; failed to produce a plane ticket or identification; and was vague about the purpose of her trip); U.S. v. Poulack, 82 F. Supp. 2d 1024 (D. Neb. 1999)(Kopf, J.)(holding officer lacked reasonable suspicion where the driver appeared nervous, but his driver's license and rental vehicle documents were valid, and a computer check showed no outstanding warrants); Kirkpatrick, 5 F. Supp. 2d at 1045 (D. Neb. 1998)(Kopf, J.)(holding the officer lacked reasonable suspicion where the defendant was coming from drug-source state and going to a drug-destination city; was driving a rental car; was on a four-day trip; had flown to pick up his niece and drive her one-way home, an itinerary considered unreasonable by the officer;

and exhibited "kinesic" factors, liking touching his nose which, according to the officer, indicated the defendant was lying).

Based on the credible evidence submitted at the hearing, Deputy Sheriff Engel lacked reasonable suspicion justifying his act of detaining the defendant when the defendant attempted to leave the officer's vehicle in response to the officer's request for consent to search.

C.     Consent to Search/Purge the Taint.

The government argues that the defendant consented to a search of his vehicle.  The defendant argues that he did not voluntarily consent to a vehicle search and any consent given cannot purge the taint of the defendant's unlawful detention. The government did not address the defendant's "purge the taint" argument.

Determining whether a consent to search purges the taint of a prior Fourth Amendment violation requires a two-part inquiry. The court must decide:  1) if the defendant voluntarily consented to the search, and 2) whether this consent was given under circumstances that render it an independent, lawful cause of discovering the incriminating evidence.  United States v. Becker, 333 F.3d 858, 861 (8th Cir. 2003).  A defendant's involuntary statement of consent cannot purge the taint of a prior unlawful detention.

In assessing the voluntary nature of a consent, the precise question is not whether the defendant consented subjectively to Deputy Sheriff Engel's search of the Nissan Versa, nor whether the officer actually believed he consented, but rather whether a

reasonable officer under the circumstances would believe the defendant provided a valid consent.  United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001); United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998).  See also Illinois v. Rodriguez, 497 U.S. 177, 188 (1990).  The defendant's "actual subjective state of mind at the time that he allegedly gave his consent is not determinative; our focus, rather, is on how a reasonable person could have perceived his state of mind at that time."  United States v. Cedano-Medina, 366 F.3d 682, 685 (8th Cir. 2004).

The Eighth Circuit has summarized the analysis required in determining if a defendant voluntarily consented to a search.

> A court determines whether consent is voluntary under the totality of the circumstances. . . .  In evaluating the reasonableness of the officer's belief [that the search was consensual], we consider the characteristics of the person consenting, including the party's age, intelligence and education, whether he was under the influence of drugs or alcohol, whether he was informed of his right to withhold consent, and whether he was aware of rights afforded criminal suspects.  We also consider the environment in which the alleged consent took place, specifically (1) the length of time he was detained; (2) whether the police threatened, physically intimidated, or punished him; (3) whether the police made promises or misrepresentations; (4) whether he was in custody or under arrest when the consent was given; (5) whether the consent occurred in a public or a secluded place; and (6) whether he stood by silently as the search occurred.

United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005)(internal citations omitted).  See also, United Staes v. Mancias, 350 F.3d 800, 805 (8th Cir. 2003).  "The factors should not be applied mechanically, and no single factor is dispositive

or controlling." [U.S. v. Sanders, 424 F.3d 768, 773-74 (8th Cir. 2005)](#).

The defendant is an adult, and was able to freely converse with the officer in English.  The defendant did not appear to be under the influence of alcohol or drugs, and although he was not informed of his right to refuse consent, he did have past experience with the criminal justice system and would have been advised of his rights in past proceedings.  The defendant was apparently aware of that right to refuse to consent to a search, as evidenced by his attempt to ignore the officer's request for consent, exit the officer's vehicle, and go on with his travel.  Deputy Sheriff Engel did not promise or misrepresent anything, and made no threats to secure the defendant's statement of consent.  The officer's request for consent occurred less than twenty minutes after the traffic stop was initiated.  The stop occurred in the daytime on a public highway.

The foregoing factors support a finding that the defendant's consent was voluntary.  However, the factors to be considered in assessing consent "should not be applied mechanically, and no single factor is dispositive or controlling." [U.S. v. Sanders, 424 F.3d 768, 773-74 (8th Cir. 2005)](#).  The overarching question is whether the consent was "freely and voluntarily given, and not the product of implicit or explicit coercion." [U.S. v. Castellanos, 518 F.3d 965, 969 (8th Cir. 2008)](#).

Deputy Sheriff Engel dominated the encounter with the defendant, and his domination was evident to any objective observer.  When the defendant attempted to exit the vehicle rather than respond to a request to search, he was forcefully instructed to remain seated.  While the defendant was not

formally advised that he was under arrest, he was certainly not free to leave.  The officer requested consent to search four times in less than one minute before receiving the sought-after response.  After the first request, the defendant unsuccessfully attempted to leave.  The defendant's specific words in response to the officer's second request are inaudible, but his tone and the officer's followup question clearly indicate the defendant remained unwilling to consent.  When substantially the same response was received following the officer's third request, the officer called for additional backup assistance in the defendant's presence.  The defendant was now fully aware that more officers would soon be arriving at the scene.  After calling for additional officers, Deputy Sheriff Engel re-directed his attention to the defendant stating, "I'm just asking you the question," to which the defendant responded that although he had been cooperative, he now felt accused, a claim the officer denied.  Finally, in response to the officer's fourth request for consent, the defendant said, "Yes, go ahead."

Upon review of the in-car camera recording, it is evident the officer was not going to let the defendant leave and continue his travel, he was not going to take "no" for an answer to his request for consent, and he was going to search the defendant's vehicle.  Although the defendant never specifically withdrew his statement of consent and never specifically asked the officer to stop the search, within a minute after the officer obtained the consent, the defendant initiated contact with the officer (who was then standing outside the vehicle) and objected to waiting any longer for the search to start.  The officer responded by summarily stating to the defendant that he had consented to the search, the search would not begin until another officer arrived, and instructing the defendant to roll up his window all the way.

Although the defendant uttered the words, "Yes, go ahead," and shortly thereafter stated, "Go ahead and search the vehicle, you won't locate those items," in response to the officer's request for consent, a reasonable officer in Deputy Sheriff Engel's position would not have believed the defendant was doing anything other than resigning himself to the inevitable. Instead, a reasonable officer would have interpreted he defendant's responses as indicating he was unwilling to consent to a search, wanted to leave, but would not be allowed to leave unless he consented to a vehicle search.[5] See e.g., U.S. v. Gutierrez-Lopez, 1992 WL 45772, 1 (9th Cir. 1992) (holding a reasonable officer would not have interpreted a consent as voluntary where the defendant admittedly "looked scared" and was asked three times for consent to search before she finally said, "Si."). Under the totality of the facts presented, I conclude the defendant did not voluntarily consent to a search of his vehicle but rather acceded to the officer's demands.[6]

---

[5]The Seventh Circuit has specifically enumerated "the repeated and prolonged nature of the request for consent" as a factor to be considered in determining if a consent is voluntary. U.S. v. Rojas, 783 F.2d 105, 109 (7th Cir. 1986).

[6]The government may argue that based on the defendant's statement to DEA Special Agent Slater on January 31, 2008, the defendant chose to consent because he believed there was a higher risk the drugs would be found if he refused consent and a drug dog was called to the scene. However, in assessing whether evidence must be suppressed as a consequence and deterrent for failing to obtain a voluntary consent before searching a vehicle, the court must focus on what a reasonable officer would have believed under the circumstances. The defendant's after-the-fact description of his "actual subjective state of mind at the time that he allegedly gave his consent is not determinative." United States v. Cedano-Medina, 366 F.3d 682, 685 (8th Cir. 2004).

The defendant's involuntary statement of consent neither purged the taint of the prior illegal detention, nor authorized the officer's search of the vehicle without a warrant or probable cause. Moreover, even if the consent could be considered voluntary in the absence of a Fourth Amendment violation, defendant's statement of consent occurred immediately following or within the course of the defendant's unlawful detention. No attenuation existed between the detention and the consent, and any consent received was the fruit of Deputy Sheriff Engel's unlawful seizure of the defendant.

Apparently, when the defendant saw Deputy Sheriff Engel find the packages containing suspected illegal drugs, the defendant told Deputy Sheriff Jenson that the contents were cocaine. As to the defendant's Fourth Amendment argument requesting suppression of this statement, the government bears the burden of proving the attenuation between the unlawful detention and search and the defendant's statement was sufficient to purge the taint of the Fourth Amendment violations. U.S. v. Yousif, 308 F.3d 820, 830 (8th Cir. 2002). There is no evidence of any attenuation between the illegal detention and vehicle search and defendant's inculpatory statement to Deputy Sheriff Jensen.

As to the defendant's Fifth Amendment argument, the government has the burden of proving the admissibility of the statement before it may come into evidence. U.S. v. Ollie, 442 F.3d 1135, 1143 (8th Cir. 2006). The government has failed to offer any evidence as to how or under what circumstances the defendant's January 24, 2008 statement to Deputy Sheriff Jensen was made.

The defendant's Fourth Amendment rights were violated when he was unlawfully detained and his vehicle was searched in the absence of his voluntary consent. The defendant's motion to suppress the evidence found during the search of his vehicle on January 24, 2008 should be granted. His motion to suppress the statement to Deputy Sheriff Jensen as fruit of the illegal detention and search should be granted. Finally, the government has failed to meet its burden of showing the defendant's statement to Deputy Sheriff Jensen on January 24, 2008 is admissible under the Fifth Amendment.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Richard G. Kopf, United States District Judge, that the defendant's motion to suppress, filing 28, be granted.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

DATED this 10th day of June, 2008.

BY THE COURT:

s/ *David L. Piester*

David L. Piester
United States Magistrate Judge